Dorothea Stephens, Appellee, v. William Nixon, Appellant.

Gen. No. 10,286.

Opinion filed July 7, 1949. Rehearing denied August 12, 1949. Released for publication August 15, 1949.

A. H. HANNEKEN and WARNER & WARNER, all of Dixon, for appellant; A. H. HANNEKEN and HENRY C. WARNER, both of Dixon, of counsel.

RALPH M. EATON, of Mount Carroll, for appellee.

MR. JUSTICE DOVE delivered the opinion of the court.

The complaint in this case was filed on July 31, 1947 and consisted of two counts. The first count alleged that on April 1, 1947, the plaintiff was unmarried and on that day she promised to marry the defendant on or before May 14, 1947. It was then alleged that the defendant, at the same time, promised the plaintiff to marry her on or before May 14, 1947, or at such other time as she might request. It is then averred that the plaintiff relying upon said promise, left her home in St. Joseph, Missouri and came with the defendant to Dixon, Illinois and charged that on the 14th day of

May 1947, the defendant failed and refused to marry her and alleged that she has remained unmarried and has been at all times ready and willing to marry the defendant but that he, the defendant, has refused and still does refuse to marry her. For this breach of contract plaintiff demanded judgment for $50,000.

The second count repeated the foregoing allegations of count one and further alleged that on July 17, 1947, in consideration of the plaintiff foregoing her right to bring suit for breach of promise against the defendant, the defendant agreed to pay to the plaintiff the sum of $100 per month starting on August 1, 1947 and continuing on the first day of each month thereafter so long as the plaintiff remained unmarried and further agreed that she might have exclusive possession and live in a residence located on a described tract of land in the city of Dixon, Illinois, rent free for so long as she remained unmarried and that the defendant further agreed to pay the cost of an operation on the plaintiff's spine, including hospital expense, doctor bills and nurse bills incurred by said operation. It is then alleged that the plaintiff accepted said offer of compromise and on the 26th day of July 1947, tendered to the defendant an agreement in writing outlining the offer which the defendant had made and which the plaintiff had accepted. It was then charged that the defendant refused to execute the written agreement and refused to carry out its terms to the damage of the plaintiff of $50,000. This count of the complaint set forth in haec verba an unexecuted written agreement.

The answer of the defendant to count one of the complaint denied all the allegations thereof except the one alleging that the plaintiff was unmarried and as to that allegation the defendant stated that he was not advised thereof. In his answer to the second count, the defendant admitted that on July 26, 1947, he was tendered the agreement set forth in count two

of the complaint and admitted that he refused to execute it but denied that he ever agreed to make the payments or do any of the things alleged in count two in consideration of the plaintiff foregoing her right to bring an action against him for breach of promise.

A jury trial was had resulting in a verdict finding the issues for the plaintiff and assessing her damages at $2,500. After overruling motions for judgment notwithstanding the verdict and for a new trial, judgment was rendered upon the verdict and defendant appeals.

The evidence discloses that appellant is a bachelor, forty-three years of age at the time of the trial and operated a retail mercantile business in Dixon. Appellee testified she was a single woman at the time of the trial and that her marital status between April 1, 1947 and the time of the hearing had not changed; that she was forty-one years of age and was born on May 12, 1906. Appellant testified that about November 1, 1946, he had a conversation with appellee and asked her to marry him; that on April 1, 1947, she repaid to him a loan of $10,000 and then said to him: "Now, I have performed my promise, when are you going to fulfill your promise to marry me"; that he, appellant, replied: "Dorothea, when the house is ready for us to move into like other human beings, at that time I will marry you." Appellant further testified that at the time of this conversation his house was undergoing repairs and that the repairs were not completed until August 2, 1947.

The record further shows that in May or June 1947, appellee consulted Mr. John P. Devine, who has been practicing law in Dixon since 1905. Mr. Devine did not appear for or represent appellee upon the trial of this cause but testified as a witness in her behalf. He testified that on or about July 16, 1947, he had a conversation with appellant in which he stated to appellant that appellee had told him that appellant had agreed to marry her and that she had authorized him

to find out when appellant was ready to carry out that agreement. Appellant replied that he had agreed to marry her but was not going to carry out that agreement; that appellant then inquired of Mr. Devine "What does she want?" To which Mr. Devine replied: "I can't answer that. The only thing she has directed me to do was to find out when you are ready to go through with the marriage." Appellant then said: "Do you know what she wants?" and the witness replied that he did not and appellant then requested Mr. Devine to find out and let him know. In a subsequent conversation Mr. Devine told appellant that appellee wanted $10,000 and appellant said he couldn't pay that amount but would give her $100 per month, allow her to live in his house, rent free as long as she remained unmarried and would pay all expenses in connection with her operation. Mr. Devine then told appellant he would submit that offer to appellee. He did so and appellee accepted the offer and Mr. Devine so advised appellant. After appellee had accepted the offer of appellant, according to the testimony of Mr. Devine, he, Mr. Devine told appellant he would reduce the agreement to writing and submit the writing to appellant. Mr. Devine did so. Appellant again called at the office of Mr. Devine and Mr. Devine handed him a written instrument stating: "this contains the agreement you made." Appellant read the agreement, said "yes" and stated that he wished to take it to his attorney, Mr. A. H. Hanneken, for him to look over.

This instrument, a portion of which was set forth in the second count of the complaint and which was identified upon the hearing by appellant and by Mr. Devine, was admitted in evidence and is as follows, viz:

WHEREAS there has been a matter of controversy between Dorothea M. Stephens (also sometimes known as Dorothea Mae Haynes) hereinafter referred to as party of the first part, on the one side and William

Nixon, hereinafter referred to as party of the second part, on the other side, as to whether or not the said William Nixon contracted, promised and agreed to marry the party of the first part.

AND WHEREAS the party of the first part claims that the said party of the second part did contract, promise and agree to marry the said party of the first part.

AND WHEREAS the parties hereto have agreed upon a settlement of said controversy.

Now, Therefore, the parties hereto agree to settlement of said controversy as follows:

1. In consideration of the party of the first part foregoing her right to bring suit for breach of promise the party of the second part hereby agrees to pay to the party of the first part the sum of One Hundred ($100.00) Dollars per month starting on the 1st day of August, A. D. 1947 and continuing payment on the first day of each month thereafter so long as the said party of the first part remains unmarried. The payment of One Hundred ($100.00) Dollars per month shall be deposited in —— Bank to the credit of the party of the first part.

2. Said second part agrees that the party of the first part may have exclusive possession and live in the residence property located on the premises described as follows, to-wit:

West One Hundred (W100') Feet of the North Forty (N40') Feet of Lot Three (3), Block Twenty-six (26) in the original town (now city) of Dixon, Lee County, Illinois

rent free, so long as she remains unmarried and said second party further agrees that he will maintain said residence property in an ordinary state of repair and during the period of occupancy by the party of the first part he will pay all taxes and assessments levied against said described real estate and that he will at no time directly or indirectly interfere with the peaceful possession of the party of the first part.

3. The party of the second part further agrees that whereas the party of the first part has sustained an injury to her spine and that an operation is necessary to correct same that he will promptly pay all hospital expense, doctor bills and nurses bills incurred by said operation.

4. In the event that the party of the second part shall fail or refuse to make the payments of One Hundred ($100.00) Dollars a month as herein agreed on the first day of each month as herein provided the party of the first part shall have the right to elect whether or not she shall bring suit each month for the payment or permit the same to accumulate in such amounts as she shall see fit and that the bringing of a suit in any one month shall not be a bar for her bringing suit each month or at such time or times as she may see fit.

This agreement is entered into by way of compromise and settlement and for the purposes herein stated, and is in full satisfaction of all claims and actions of every kind and nature from the beginning of the world to the present date that the party of the first part has against the party of the second part.

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals this — day of — A. D. 1947.

——————(SEAL)
——————(SEAL)

Appellant testified that he was acquainted with Mr. Devine and had been all his life; that he had never transacted any legal business for him and that on the second Monday in July 1947, he went to Mr. Devine's office in response to a telephone request from Mr. Devine. As abstracted by counsel for appellant this is what occurred: Mr. Devine said, "Beno, I hear you have a pretty nice home. What do you think it is worth?" I said: "I think it is worth about $25,000.00." He said, "That is what we want." I said who wanted it, and he said: "Mrs. Stephens. She

was up here this morning and told me that she wants your home." I said, "John, I think you are all wet." And John said to me, he said: "Well, Beno, how about having Mrs. Stephens come up after dinner and you talk to her and see if you can't talk to her." I said: "John, I don't need any lawyer to arrange a wedding for me." He said, "Do you intend to marry her or not?" I said: "I told Dorothea I would marry her when the house was finished. I told her that last November, and I have told her that since." He said, "O.K." and I left. At the time of this conversation they were finishing the painting on the inside of the house. The house was finished August 2, 1947. This suit was commenced July 31, 1947. At three o'clock on the same day he called me again and asked me if I would come back up and I went back up and he said "I have talked to Mrs. Stephens and she wants $10,000.00 cash." I said: "John, I think I had better go see a lawyer." He said: "You don't need a lawyer. Why waste your money to pay a lawyer if we can straighten this out." I said, "John, in what way?" He said: "Would you be willing to pay Mrs. Stephens $10,000.00?" I said: "No, I will not." He said: "Don't you think it would be better if you give her the .$10,000.00 and she leaves town and you forget about her and have the whole thing over with?" I said: "No, I don't feel that way about it." He said: "What are you willing to do?" and I said: "I will give her $100.00 a month and my home to live in," and he said, "For how long?" I said, "Until she is married." We were still figuring—I was still going to marry her at that time. John Devine asked me what I would do and I told him. He said, "How about an operation on her back. She has to have an operation." I said, "I have known about that and I will pay for that at any time she wants to have the operation." I had been after her to have that operation six months ago and up to that time I certainly wanted her to have that corrected.

Mr. Devine asked me what I intended to do about an operation she had to have on her back, and I explained that I was perfectly willing to take care of it; that I had wanted her to have it taken care of for six months up to that time, and he said to me: "I don't think that Mrs. Stephens will accept anything like this because she wants cash," and I walked out of John Devine's office. I did not go to a lawyer and about ten days later John Devine called me back to his office again. He handed me these two typewritten sheets and said, "I have drawn up an agreement from our talk the other day. Here are some papers for you to sign." I said, "Let me read them." I read them and I said "I think it is time I had a lawyer." He said, "That is what you agreed to do. All you have to do is sign it." I said, "No, I did not agree to that." I asked John Devine why he had a notation "furniture" written across the top of the agreement. He said, "Mrs. Stephens says her furniture is in your home down there, and you also have quite a bit of furniture there, and that it would have to be left in the home for her to use there." I said, "I cannot agree to any of the terms of this agreement," and I took the contract and went to my lawyer, Mr. Hanneken.

In rebuttal Mr. Devine denied substantially everything testified to by appellant not in harmony with his version of the settlement as previously testified to by him.

Counsel for appellant contended in the lower court and contend here that the conversations between Mr. John P. Devine and appellant amounted only to negotiations which were not to constitute a contract until those negotiations were embodied in a written agreement and executed by the parties. Counsel for appellee insist that the evidence discloses that a complete oral contract had been entered into by the parties hereto in settlement of their controversy and that there was no intent on the part of either appellant or appellee to reduce the agreement to writing until after a

completed oral agreement had been entered into by the parties. Both parties are in agreement as to the applicable law and both parties cite *Baltimore & O. S. W. R. Co. v. People ex rel. Allen*, 195 Ill. 423 at page 428. where the Supreme Court quoted from American and English Encyclopedia of Law: "The true rule may be stated in these words: Where the parties make the reduction of the agreement to writing, and its signature by them, a condition precedent to its completion, it will not be a contract until that is done. And this is true although all the terms of the contract have been agreed upon. But where the parties have assented to all the terms of the contract, the mere reference to a future contract in writing will not negative the existence of a present contract," and continued "Here it is apparent that the parties did not on the day of the acceptance, assent to all the terms of the contract, but the approval of the contract itself was expressly reserved for future action. The contract, when executed, being broader than the proposal or bid, evidences that fact. The parties made the reduction of the agreement to writing, and its signature by them, 'a condition precedent to its completion.' "

In the instant case the instructions clearly defined the issues made by count two and the answer of the defendant thereto. The jury were also told that there were no other issues in the case for them to decide. They were instructed that no evidence had been offered as to the cost of an operation on plaintiff's spine or of hospital bills and nursing and were told not to speculate or guess as to what the cost of such an operation might be and that as no proof had been offered on this matter, it should be no part of their deliberation. The jury was told that their verdict must be based upon the evidence, that sympathy for the plaintiff should have no influence upon them in determining whether or not the defendant was liable and after fully stating what the allegations of the second count of the complaint

were, instructed the jury that the burden of proving these allegations by a preponderance of the evidence was upon the plaintiff and that if the jury found, from the evidence that she had failed to do so, they must find the issues for the defendant. The jury was further instructed that in order to make a valid contract the minds of the parties must have met and that if it appeared from the evidence that the terms proposed were understood differently by the parties there was no meeting of the minds and that before there could be a contract between these parties, their minds must have come together and agree upon all the terms and conditions of the contract.

██ ██ The jury by their verdict resolved the issues made by the pleadings in favor of appellee, found that there was no written contract contemplated until after the full terms of the settlement had been arrived at and agreed upon by the parties. While the evidence is conflicting it was the province of the jury to determine who was telling the truth. The verdict which the jury returned is sustained by the evidence.

██ Counsel for appellant state that inasmuch as no evidence was offered by the plaintiff to sustain the first count of her complaint appellant was entitled to a formal judgment in his favor on that count. The report of proceedings does show that the plaintiff abandoned her first count and counsel for appellee, during the trial, stated that count one no longer exists and "we have made no effort to prove the allegations of that count." While no formal order was entered dismissing that count the error in not doing so was harmless to appellant and his counsel have not shown any injury or prejudice resulting from this omission.

██ It is also insisted that the trial court erred in admitting in evidence the Wigglesworth Mortality Tables and in refusing an instruction tendered by appellant in connection with this evidence and in giving an instruction to the effect that the jury might take

into consideration the life expectancy of the plaintiff as shown by those tables. The evidence was that appellant would pay appellee $100 per month and give her free house rent so long as she remained unmarried. It does not follow that because appellee had a life expectancy of 25.61 years she would remain unmarried for the next quarter of a century. It is apparent the jury did not think so either. While we think appellant's objection to the admission of this evidence should have been sustained, it was not reversible error in this case.

■ We do not believe the court erred in refusing to admit in evidence the marriage licenses and divorce decrees offered by appellant. The question of whether appellee was married or divorced was not an issue in this case.

■ The evidence disclosed that the fair, cash rental value of the house of appellant located on Crawford avenue and described in the second count of the complaint was $85 per month. This amount, together with the $100 per month, which according to Mr. Devine appellant agreed to pay appellee each month beginning August 1, 1947, formed the basis of the verdict. The verdict was returned on January 16, 1948 for $2,500. At that time $1,295 had accrued upon the contract which the jury found the parties had entered into. While this record is not free from error we agree with the trial court that the verdict is justified by the evidence and that substantial justice has been done.

The judgment of the circuit court of Lee county will be affirmed.

*Judgment affirmed.*